T. GOULD & COMPANY *et al.*, plaintiffs in error, *vs.* THE MAYOR AND GENERAL COUNCIL OF THE CITY OF ATLANTA, defendant in error.

1. The power in the charter of Atlanta to tax itinerant traders is not lawfully exercised by the adoption of an ordinance to tax those intinerant traders only who are non-residents of the city. No tax can be imposed on non-resident traders without imposing a like tax on resident traders of the same class.

2. Is a tax on the amount of sales made within the city by intinerant traders, a tax on property, and can it exceed the rate per cent. *ad valorem*, imposed on other property taxed. *Quære ?*

3. A trader who opens a house within the city for the purpose of selling out therein a stock of goods, who deposits in the house a large stock and proceeds to sell them out, in the one place, by auction or otherwise, who does not convey any of the goods, or carry samples thereof, from point to point in the city for the purpose of sale, exhibition or the solicitation of orders, and who waits for customers to come to him at the location where he has established his business, is not an itinerant trader, within the meaning of the charter of Atlanta or of the general statutes of Georgia.

4. An illegal tax ordinance which requires returns and payment to be made within an hour after the tax accrues, then, in case of default, doubles the tax and sends forth execution, and, finally, denounces penal infliction for non-payment, is better resisted by injunction than by affidavit of illegality, or other common law remedy; more especially as the party invoking protection is carrying on a large business which exposes him to numerous successive levies, day after day, for alleged non-compliance with the ordinance, and as the municipal authorities, having made one levy, threaten a repetition daily so long as the business is prosecuted.

Tax. Peddlers. Injunction. Illegality. Before Judge PEEPLES. Fulton county. At Chambers. January 26th, 1876.

Reported in the opinion.

D. F. & W. R. HAMMOND; HULSEY & HULSEY, for plaintiffs in error.

W. T. NEWMAN; O. A. LOCHRANE, for defendant.

BLECKLEY, Judge.

The complainants, Joiner & Ellis, are auctioneers residing in the city of Atlanta, and having a regular municipal license

to pursue their calling. The other complainants, T. Gould & Company, are residents of the city of New York. The latter firm shipped from New York to Atlanta, a stock of merchandise, consisting of carpets, woolens, and a general assortment of dry goods, the whole worth about $40,000 00. The packages arrived by railroad, marked and consigned to T. Gould & Company, and were, by them and their employees, opened in a house on Whitehall street, rented for the purpose by Joiner & Ellis, the money to pay the rent being furnished by T. Gould & Company. This house was procured because the regular auction-house of Joiner & Ellis was not large enough to accommodate the stock, and because T. Gould & Company wished their goods kept separate from all others. Joiner & Ellis obtained from the city a fresh license as auctioneers, covering this new place of business, and advertised that the goods would be there sold by them at auction, from day to day, until the entire stock should be disposed of. By an arrangement between them and T. Gould & Company, they were to receive a commission on the sales, and were to comply with the city ordinances in reference to keeping accounts, making returns, and paying taxes at the regular rates on auction sales. They, however, did not have full and complete control. They did not keep the keys of the store at night, nor did they receive or handle the cash.

When the sale commenced, one of the firm officiated as auctioneer for about fifteen minutes, and then gave place to Mr. T. Gould, who was the real crier of the auction. He and his partner went on with business, seemingly under a mere nominal supervision of Joiner & Ellis, who were interested, doubtless, to the extent of the agreed commissions, and who held themselves responsible for verifying accounts, making returns, and seeing that all taxes were paid, as if the goods had been sold by themselves on regular consignment. Indeed, both they and their principals called and treated it as a consignment, notwithstanding the active part taken by the latter in transacting the business and the comparatively passive part taken by the former. They appear to have thought that the

arrangement between them was the legal equivalent of exposing goods at auction by resident licensed auctioneers, at their own stand, by themselves or their agents, in the due course of such business. On the other hand, the city authorities considered the arrangement as merely colorable; they regarded T. Gould & Company as having retained possession of their goods; as never having made any consignment or delivery of them to Joiner & Ellis; and as engaged in selling them themselves, by their own auctioneer, using the name of Joiner & Ellis as a cover. What the relation between the two firms actually was we shall not undertake to decide. We find it unnecessary to do so. For the purposes of the present case, we shall assume that T. Gould & Company can derive no protection whatever from connecting themselves with Joiner & Ellis, and that they are to be treated in this controversy as if they had acted throughout alone. We shall apply to them that law which we think would be applicable if they, being residents of New York, had brought hither from thence, by railroad, a large stock of goods, placed them in a house in the city of Atlanta, and then proceeded to sell them out at auction. It may be that by reason of their connection with Joiner & Ellis they are in a better situation than this supposes, but certainly they are in no worse.

The sale commenced on the 24th of January, 1876, and amounted at the close of business at night to a few dollars over one thousand. The city claimed a tax thereon of $5 00 per hundred, and accordingly issued execution against T. Gould & Company, as itinerant non-resident traders, for the sum of $50 00 and costs. On the next day this execution was levied by seizing certain of the goods. The authorities announced their purpose to issue similar process daily, if sales continued, and if T. Gould & Company failed to make returns and pay tax as itinerant traders.

The complainants thereupon filed their bill, praying that the city be enjoined from the collection of this tax. The injunction was refused by the circuit judge, and that refusal is assigned as error.

The charter of the city grants power to tax property, real and personal, to the extent of one and a half per cent. *ad valorem*, to which may be added, as an extraordinary tax, one-half of one per cent. more—in all, two per cent.   Power is also granted to exact a license or registration fee of not exceeding $25 00 on each person or firm engaged in any trade, business, avocation, calling or profession within the city. The section of the charter which relates to itinerant traders is as follows : "That said mayor and general council shall have power to levy and collect from itinerant traders who may, directly or indirectly, by themselves or others, sell any goods, wares or merchandise in said city, such tax as to them may seem proper : *Provided,* that no person or persons shall be prohibited from selling, free from tax, any number of books, maps, charts, or mathematical instruments, made in this state or elsewhere, within said city of Atlanta:" See acts of 1874.

The tax ordinance, in so far as it rests on this section of the charter, reads thus : "On each $100 00 of the amount of sales of goods, wares, merchandise, produce, shingles, lumber, and all other articles sold by transient, itinerant, non-resident speculators or traders, (not including those who bring the above mentioned articles on wagons,) there shall be levied a tax of five dollars : *Provided,* that parties making such sales as above stated return the same to the clerk of council within one hour after they have been made, and pay the tax thereon ; and in case these provisions are not complied with, then a tax of ten per cent. shall be levied and collected by execution, as in other collections of taxes.   Any person selling as aforesaid and failing or refusing to pay said tax as aforesaid, shall, on conviction before the recorder, be fined in a sum not exceeding $100 00, or imprisonment not exceeding thirty days, or both, at the discretion of the recorder, mayor, or mayor *pro tempore.*"

Under this ordinance the tax was imposed which is now resisted.   A more pungent paragraph of legislation we have not met with.   It gives but one hour to find the clerk, make the return and pay the tax.   For failure to run this fast

race, it doubles the tax and turns loose execution. It then puts the defaulter in the dock as a criminal, and forces him to submit to be fined or imprisoned. It would be difficult, we think, to recognize this ordinance as a law for raising revenue, even if it pursued the statute on which it is founded; it seems to be designed rather as a measure of prohibition, and we think, in respect at least to the shortness of the time allowed for making returns and payment, it might well be pronounced unreasonable, and therefore void.

1. But the ordinance is singularly at variance with the grant of power contained in the charter. The power is, to tax itinerant traders generally. The ordinance is no attempt to exercise the power upon residents of the city, but upon non-residents only. Again, even non-residents are not taxed if they come in wagons. This is a discrimination founded on vehicles, or modes of conveyance. If T. Gould & Company had transported their merchandise in wagons and not in railroad cars, they would have been clear of this ordinance, but having come by railroad they are within its jaws. This discrimination alone would perhaps be sufficient to render the ordinance invalid. Its chief defect, however, considered with reference to the grant of power on which it rests, is that it spends its whole force on non-residents and spares residents entirely. Suppose a citizen peddles his wares through the city, is he not an itinerant trader? and if so, where is the authority in the charter for an ordinance taxing itinerant traders that leaves him untaxed as such? When power is given to municipal corporations to impose taxes, whatever else the grant may mean, it certainly means that the citizens are to be taxed. That is the plainest and most obvious construction in all cases. Other persons may be included, but citizens must be, unless expressly excepted. It is for them, and upon them chiefly, that local legislation is to act. Until there is an ordinance that binds the citizen, there can be none (other than a mere police regulation) that binds the stranger. When the stranger comes into the city he may be watched, but he cannot be taxed if citizens of his class are not taxed, unless there

is some special grant of authority enabling the municipality to tax him as a non-resident.    As to his right to claim equality with citizens in whatever taxes are imposed: see 2 Dillon on Municipal Corporations, 631.; 5 Caldwell, 554.    The power to discriminate against him has been recognized by this court in one case involving slaves—a species of property peculiarly related to the police: 25 *Georgia Reports*, 610.

2. But were the ordinance operative alike upon resident and non-resident traders, would the tax it imposes be a lawful tax?    The limit of taxation upon property is fixed by the charter at two per cent.    By the constitution taxes upon property must be *ad valorem* and uniform upon all species of property taxed.    Municipal taxes must conform to this rule: 49 *Georgia Reports*, 562.    It follows that although the charter declares that the mayor and council shall have power to levy and collect from itinerant traders such tax as to them may seem proper, this provision of the charter must be construed either as no authority to tax the *property* of itinerant traders, or as authority to tax it at the discretion of the mayor and council, within the limits to which, by other provisions of the charter, they are confined in respect to property generally.    If the power to tax itinerant traders is absolutely unlimited, then it does not relate to taxing their property at all, but to taxing them in some other way.    The scheme of the charter is, evidently, to limit the taxation of property, and whatever does not come within the limit, either expressly or by implication, does not come within the scheme, and is therefore not to be understood as authority for taxing property.    The maximum property tax allowed by the charter being two per cent., and the tax exacted of itinerant traders by the ordinance we are discussing being five per cent., the ordinance conflicts with the charter, if this five per cent. rate is a tax upon property. Is it such, is the question?    It is laid upon the amount of sales, and is a fixed per centage on such amount.    It is due and payable within one hour after a sale is made.    It will accrue inevitably, though there be but a single transaction. Is it a tax on the contract in the nature of a stamp duty, with

no regard to the element of value, but with regard simply to the element of legal obligation? Surely not. It is not a tax on the act of transmitting title, or on the evidence of transmission. What is left, then, for the tax to reach? If only the thing sold and the price, each of these is property. If it is a tax on either it is a tax on property. Five dollars on each one hundred dollars of the amount of sales is the language of the ordinance. One dollar out of every twenty dollars of the price produced, the proceeds of sale. It is, perhaps, not mathematically certain on which the burden actually falls in a given transaction, the commodity or the price. If the price is proportionately reduced in consequence of the tax, the commodity bears the burden; and if not the price bears it. Probably, in many instances, it is shared between them, the reduction in price being less than the full amount of the tax.

The theory that this is a tax on property is not unsupported by some authority. This court has determined a kindred question in the case of *Pearce, Wheless & Company vs. The City of Augusta,* 37 *Georgia Reports,* 597, which was a tax on the gross sales of cotton ; on the gross amount of all sales of goods, wares, merchandise and produce, (except cotton;) on the gross receipts for storage, and on every $100 00 of commissions received by commission merchants and cotton factors. The tax, it will be perceived, was expressed in the ordinance to be on sales, on the gross amount of sales and of receipts, and on every $100 00 of commissions. The tax was pronounced by this court, it would seem, to be a tax upon property, and was upheld, apparently, as such. If any part of that judgment should be thought to be in conflict with *Hartridge vs. The City of Savannah,* 8 *Georgia Reports,* 23, it should be remembered that in the time intervening between the two decisions the tax laws of the state had been expanded so as to grasp nearly all values and subject them to taxation. The transition from the old system of taxing land by the acre, and other property specifically, or by the piece, to the *ad valorem* system, had become complete. There may or may not be other ways of reconciling the two cases ; or, perchance,

they may be, at bottom, irreconcilable. Things sold and money or credits received therefor are alike property; and a tax on what passes from the seller, or on what passes to him from the buyer, looks very like a tax upon property: 14 *Georgia Reports*, 438; 41 *Ibid.*, 21; 12 Wall, 418; 8 *Ibid.*, 123, 148. There is, however, a line of decisions which treat such a tax as that we are considering as no tax upon property, but as a tax upon occupation, business or employment. Cases on the subject will be found cited in Cooley on Taxation; and there is one case, a very late one, in our own Reports, which seems in full accord with that theory: 52 *Georgia Reports*, 251. How to reconcile it with the prior decision in 37 *Georgia Reports*, cited above, is more than I know at present; though I will not say the thing is impossible. It is not unlikely that a close study of the facts in the latter of the two cases would show that the judgment of the court sustaining the tax on gross sales might have been put on the ground that, even as a tax on property, it was not invalid, because other property was subjected to as high a rate of taxation in the same city. It is not necessary now to pursue the inquiry further, since we have concluded, on full reflection, to put our judgment in the present case on the first, third and fourth points in the head-notes, leaving the question open of whether the tax is upon property or upon occupation. The judgment on the application for injunction would be the same, whichever way the true law of this question might be. Other decisions of this court to be examined, in classifying taxes, though not so directly in point, are: 42 *Georgia Reports*, 506; 49 *Ibid.*, 195; 50 *Ibid.*, 530; *Wright & Hill vs. Mayor, etc., of Atlanta*, 54 *Georgia Reports*, 645.

3. We have pronounced the ordinance invalid for the reason that it taxes non-residents only. We go further, and give it as our opinion, that were it a good ordinance, it would not apply to T. Gould & Company, for the reason that on the facts of the bill, answer and affidavits before us, T. Gould & Company, are not, in any sense known to the statutes of Georgia, or the charter of Atlanta, itinerant traders. This phrase,

itinerant traders, has no precise definition in our statutes, but it is used generally, we think, as 'meaning substantially the same as the word peddlers. It is certainly so used in the oldest act we have found on the subject, that of 1796 : Marbury & Crawford's Dig., 383. Some of the subsequent acts, both in their caption and body, speak of peddlers and *other* itinerant traders, and yet, when they come to provide machinery for practical working, they seem to lose sight of any kind of trading but peddling. Thus the act of 1831, Prince's Digest, 613, taxes peddlers and other itinerant traders, who may *carry about* their wares and merchandise in wagons and other vehicles drawn by horses or mules, or packed upon horses or mules, or other animals of draught or burthen, and thus proceeds to tax peddlers or itinerant traders who may *carry about* their wares and merchandise on foot and without the aid of horses or mules or other animals. And the Code itself, except in the matter of selling by sample, seems to contemplate peddling only as the mode of itinerant trading. Any "peddler, or itinerant trader," who shall sell or vend, "without a license from the proper authority for that purpose," shall be punished, etc. : Code, section 4598. "Every peddler or itinerant trader, by sample or otherwise," must be licensed : Code, section 1631. Now, observe that the license actually provided for is to peddle, and nothing else: "In regulating peddling and fixing the cost of license therefor:" Code, section 337, parapraph 9. "For license to peddle :" Code, section 528, paragraph 6. "To peddle within the county, unless otherwise provided by the ordinary under the law :" Code, section 529. One who "peddles" without a license forfeits $100 00 for the act of peddling : Code, section 533. Disabled soldiers authorized to "peddle" without paying for a license : Code, section 534. "The peddler" shall furnish evidence of good character and take an oath. The license must describe the person of the "peddler:" Code, section 1634. There must be a separate license for every wagon, cart or other vehicle, (or each horse if the "peddling" is done on horse-back,) employed or used in "vending such goods, wares or merchandise :" Code, section

1635. License to "peddle" may be granted to indigent or infirm persons on terms discretionary with the ordinary: Code, section 1636. Foreigners, before declaring intention to become citizens, are not to have license to "peddle :" Code, section 1637. On trying a foreigner for illegal "peddling" proof of the "peddling" only is *prima facie* sufficient : Code, section 1638.

It is probable that no license ever was issued in Georgia for any kind of itinerant trading except peddling or selling by sample. And we have no idea that any person bringing a large stock of goods into a town or city, opening a house, and selling them out therein, was ever called or considered a peddler in Georgia, or ever obtained, or was supposed to need, a license as such. Such a trader may be a transient or itinerant person, but he is not, according to Georgia statutes, or the ordinary use of language in Georgia, an itinerant trader. However much he may itinerate with his person, he does not itinerate with his goods or his trade. He stations himself for traffic, and does not sell or offer one part of his stock here and another yonder, as does a roving trader. He is like a soldier in garrison, not like a soldier in the field. He offers his stock continuously to the same public in the same place. He competes with the same rivals, subjects himself to the same police, obeys the same laws and ordinances, and pays the same taxes until his stock is exhausted. He does not, perhaps, renew his stock or add to it from time to time as permanent merchants do, but quits the place when he gets through, and with another stock opens in the like way in some other state or some other city of the same state. While he trades he neither hides in a corner nor wanders from house to house, or from street to street. He establishes himself in one locality and there transacts his business. He is in a known house on a public thoroughfare. If he is taxable, there he is, and there are his goods ; assess him lawfully and make him pay. If he acts as his own auctioneer, without legal authority, he can be dealt with for that ; but he is not an intinerant trader because he sells at auction, though

he may sell unlawfully. A case not very unlike the present is found in 1 McMullen's R., 40, and the facts there were held not to amount to hawking and peddling under the statutes of South Carolina, but to another prohibited class of trading. It is not improbable that some of the English statutes regulating trade and traders would come near covering this case, as those statutes have been construed in that country; but none of them are in force here, and we have never introduced even the *word* "hawkers" into any of our legislation. I give here some citations of the English authorities: 3 Jacob's Law Dictionary, 241; 10 Petersdorf's Abridg., 206; 1 Barn. & Ald., 100; 4 *Ibid.*, 510, 517; 12 Price, 51, 65; 1 Young & J., 463.

C. J. SHAW, in Commonwealth *vs.* Ober, 12 Cush. R., 195, says, "The leading primary idea of a hawker or peddler is, that of an itinerant or traveling trader who carries goods about in order to sell them, and who actually sells them to purchasers, in contradistinction to a trader who has goods for sale and sells them in a fixed place of business." In construing the terms itinerant traders, as found in the charter of Atlanta, we suppose them to have the meaning there that they have elsewhere in our own statutes. As Judge McCay remarks in reference to interpreting the constitution, "Necessarily * * we are to take words as they have, for years past, been used and understood in legislative proceedings in this state:" 42 *Georgia Reports,* 596. In one respect, perhaps the particular words of which we are speaking, are extended in the charter beyond what they have ordinarily comprehended in statutes; and that is, they include, as the charter declares, not only those who trade themselves in person, but those who do so, directly or indirectly, by others: 51 *Georgia Reports,* 328.

4. The last question for our consideration is as to the remedy of T. Gould & Company to arrest the collection of the tax which we have adjudged illegal. Their property is now under levy, and the charge in the bill is not denied that the city authorities have threatened to issue similar executions

daily. Indeed, such would be their duty if their ordinance were valid, as they supposed it to be, and these parties were within its provisions. But the ordinance is not only invalid, but it is unique and extraordinary. It gives but one hour's indulgence, and if. its whole power were hurled upon T. Gould & Company, it could, in forty days, (the length of time required to sell out their stock, taking the first as an average day) load them with $4,000 00 in executions, $4,000 in fines, and forty months of imprisonment. Although there is no effort or threat to enforce the ordinance otherwise than by levy and sale for the tax, (and that not even doubled,) yet, as the executions are probably to amount to about forty in number, and as facing even the penal possibilities of the ordinance, must, to say the least of it, be uncomfortable, we deem injunction the safer, better and cheaper mode of resisting the tax, and the most conducive to the best interest of all concerned.

Let the injunction be granted.